788 P.2d 366

**Melisendro F. APODACA, Contestant–Appellant,**

v.

**Raymond M. CHAVEZ, Contestee–Appellee.**

No. 18518.

Supreme Court of New Mexico.

March 7, 1990.

Hinkle, Cox, Eaton, Coffield & Hensley, Paul Kelly, Jr., Frank Bond, Santa Fe, for contestant-appellant.

Potter & Kelly, Earl W. Potter, Kenneth J. Cassutt, Santa Fe, for contestee-appellee.

## OPINION

RANSOM, Justice.

Contestant Melisendro F. Apodaca appeals the decision of the trial court that upholds the election of Raymond M. Chavez to the Santa Fe County Board of County Commissioners. The case presents uncontested findings of fact that give meaningful depth to the application of residence requirements under the Constitution and statutes of New Mexico in determining qualifications of a candidate for political office; and the question before us is whether these facts reasonably support the court's decision that Chavez qualified as a candidate for the office of county commissioner. We conclude the court's findings, support its decision and affirm.

For twelve years, without interruption to the present time, contestee Chavez has maintained in Chimayo within Rio Arriba County a home where he resides with his wife and two children. This home is just across the Santa Fe County line. Apodaca testified at trial that, when he and his wife were invited to social gatherings by Chavez and his wife, the gatherings were held at the Chimayo home. Chavez acknowledged on direct examination that he and his wife sometimes entertain at their Chimayo home, that he and his immediate family have celebrated some birthdays and holidays at this home, and that they store many of their personal belongings there. The utilities and telephone for the Chimayo home are in Chavez' name. During this twelve-year period, Chavez has been employed full time in Los Alamos County.

On the other hand, throughout his life Chavez has treated El Portrero, roughly two miles from his Chimayo home and across the county line within Santa Fe County, as his permanent residence. His family has resided there in a placita adjacent to the Santuario de Chimayo[1] for at least 175 years. Chavez spends a substantial portion of his time at El Portrero, working the family farm with his father and brother, helping his parents by paying bills and handling other financial and legal matters, taking meals with his parents, siblings, wife and children, and frequently sleeping in his own room at the house. He also keeps clothing, tools, and other personal belongings at El Portrero. Chavez' father testified that his son sleeps at El Portrero approximately three to four nights per week, and Chavez testified that during the summer months, when there is a great deal of work to be done on the family farm, he spends around seventy percent of his time at El Portrero.[2]

It long has been the understanding of the Chavez family that Chavez, as the youngest son, will inherit the family home and will take responsibility for the welfare of his parents as they grow older. In February 1985, Chavez' parents executed an agreement formalizing their intention to leave to him their home at El Portrero. In July 1988, Chavez' parents deeded to him title to the home. The telephone and utilities remain, however, in the name of Chavez' father.

Chavez obtained the land for his Chimayo home from his godfather. The court found that this was a temporary home, and that it was built in Rio Arriba County because of a lack of space at El Portrero. Chavez and his wife intend to take exclu-

---

1. The Santuario de Chimayo is a sacred shrine of considerable historical importance. Each year at Easter, thousands of pilgrims travel by foot to the Santuario to worship.

2. We understand this reference to refer to Chavez' time away from work. The time spent traveling to and engaged in work in Los Alamos County appears to be irrelevant to the question of whether Chavez was a resident of Santa Fe County or, as claimed by Apodaca, a resident of Rio Arriba County.

sive possession of the family home at El Portrero upon the death of his parents and use that home as his sole residence. He also intends to divide his Rio Arriba property between his son and daughter.

A member of the Chavez family generally is credited with having built the Santuario as a family chapel in 1816. The trial court found that successive generations of the Chavez family have served as caretakers of the Santuario and that Chavez' parents are now the caretakers of the Santuario. The court also found that Chavez appears to be in line to serve as successor to his parents. Chavez testified that his father sometimes calls him at night for assistance at the chapel, and that during the annual Easter pilgrimage to the Santuario he spends most of his free time there.

Chavez has listed El Portrero as his residence for voter registration purposes, has voted in Santa Fe County for twenty years, and has served on Santa Fe County jury panels. He receives mail at the El Portrero address and uses that address on his driver's license, tax returns, bank accounts and other important documents. The trial court found that Chavez has served on the Santa Fe–Pojoaque Soil and Water Conservation District Board and the Santa Fe City–County Extraterritorial Zoning Commission, has been an elected officer of the Santa Cruz Irrigation District, which services El Portrero, and has served as president of Holy Family Parish in El Portrero. The court also found that Chavez never has served on nor belonged to similar organizations or entities in Rio Arriba County.

The New Mexico Constitution requires county officers to be county residents. The legislature may provide further that county commissioners reside in their respective county commission districts. N.M. Const. art. V, § 13. Pursuant to Section 13, the legislature has declared that, in a county having a population the size of Santa Fe County, each county commissioner shall be a resident of the district from which he is elected and that, if any commissioner permanently removes his residence from or maintains no residence in the district from which he was elected, he shall be deemed to have resigned. NMSA 1978, § 4–38–3(A) (Cum.Supp.1989). The Constitution also provides that, as a condition to holding elective public office, a person must be a legal resident of the State and a qualified elector (voter), who, to be qualified, must reside in the precinct in which he offers to vote for thirty days immediately preceding the election. N.M. Const. art. VII, §§ 1 and 2(A).

Apodaca argues that, since a candidate must be a qualified, registered voter of the precinct where the candidate votes, the criteria for determining the residence of a candidate are contained in the statute setting forth the rules for determining the residence of a voter, i.e., NMSA 1978, Section 1–1–7(A–J) (Repl.Pamp.1985). In pertinent part, that statute provides:

> For the purpose of determining residence for voting, the place of residence is governed by the following rules:
>
> A. the residence of a person is that place in which his habitation is fixed, and to which, whenever he is absent, he has the intention to return;
>
> B. the place where a person's family resides is presumed to be his place of residence, but a person who takes up or continues his abode with the intention of remaining at a place other than where his family resides is a resident where he abides;
>
> C. a change of residence is made only by the act of removal joined with the intention to remain in another place. There can be only one residence;
>
> \* \* \* \* \* \*
>
> F. a person does not lose his residence if he leaves his home and goes to another country, state or place within the state for temporary purposes only and with the intention of returning;
>
> G. a person does not gain a residence in a place to which he comes for temporary purposes only....

Apodaca maintains that, as there can be only one residence (Subsection C), Chavez must be seen as a resident of Rio Arriba County because he has maintained a home there with his wife and children (Subsection B) for twelve years.

■ *Candidate not precluded from maintaining two homes.* Acknowledging that a person can register only one residence for voting purposes, Chavez nonetheless argues that a voter or a candidate is not prohibited from maintaining more than one home. Section 1–1–7.1, governing residence for purposes of candidacy, provides:

For the purpose of determining the residence of a person desiring to be a candidate for the nomination or election to an office under the provisions of the Election Code ..., permanent residence shall be resolved in favor of that place shown on the person's affidavit of registration as his permanent residence, provided the person resides on the premises.

Chavez argues that Sections 1–1–7(C) and 7.1 merely codify this Court's pronouncement in *State ex rel. Magee v. Williams,* 57 N.M. 588, 261 P.2d 131 (1953), and do not preclude the possibility of multiple residences. We agree.[3] In *Williams,* this Court said:

To interpret the sense in which such a term "reside" is used, we should look to the object or purpose of the statute in which the term is employed. *A man can have only one place of residence for voting purposes* and certain other pur-

poses, but there is no reason, why, within the meaning of the above sections of the constitution, he may not have more than one place to reside in. A man may have a city home, ranch home, summer home, as respondent in the case at bar had, and also a place of permanent abode....

In case of doubt as to a voter's residence, *it is resolved in favor of the permanency of residence in the precinct where he casts his ballot.*

*Id.* at 592–593, 261 P.2d at 133 (emphasis added). In *Williams,* the candidate maintained multiple homes from the time he arrived in Truth or Consequences, sometimes spent long periods exclusively at his ranch home, and had lived in several different places within the city limits. At the time of the election contest, the candidate still did not reside exclusively at his city home. Dr. Williams maintained his medical practice in Truth or Consequences, however, voted in Truth or Consequences, and intended to remodel his current city home and reside there permanently.

Some cases cited by Apodaca concern situations in which a person occupied two or more residences consecutively, but did not currently maintain a physical presence at more than one residence.[4] *See, e.g.,*

---

3. Apodaca correctly notes that some sections of Section 1–1–7 go beyond the holding of *Williams* and contain independent legal principles. *See, e.g.,* § 1–1–7(B). We do not agree, however, with Apodaca's argument that Section 1–1–7.1 conflicts with our holding in *Williams.* Apodaca argues that such conflict must be inferred from the replacement by the 1985 legislature of the phrase "in the precinct where the person is registered *and eligible to cast a ballot*" with the phrase "provided the person resides on the premises." *See* 1985 N.M. Laws, Ch. 207, § 1 (emphasis added). We note that, in order to be eligible to cast a ballot, a person must be a resident. Therefore, the question prior to 1985, like the question today, was whether a person resides in the place where that person is registered to vote.

4. Apodaca cites two out-of-state cases involving a candidate who maintained a presence at two residences and sought to base his candidacy on one of the two. *See Mix v. Blanchard,* 318 So.2d 125 (La.App.), *writ refused,* 320 So.2d 547 (1975); *In re Carabello,* 102 Pa.Commw. 129, 516 A.2d 784 (1984). The candidate was unsuccessful in each of these cases in attempting to establish that he resided at his ancestral home

and not at the home of his nuclear family. However, neither of these cases convinces us that the trial court erred below, given the facts and the applicable law.

Candidate Carabello claimed to reside at the house of his mother and aunt. He visited this house frequently and sometimes slept there. In addition, he claimed to reside there because, since the recent death of his father, he had become the "padrome" of the extended family. Although the *Carabello* court stated in dictum that it did not believe this evidence established that Carabello was "domiciled" at his ancestral home, the court's holding turned on a statute that *conclusively established* the residence of a married person to be the abode of his or her spouse and children. 102 Pa.Commw. at 132, 516 A.2d at 786. As acknowledged by Apodaca, Section 1–1–7(B) creates only a rebuttable presumption that the person resides with his or her family.

In *Blanchard,* as in the present case, the candidate slept three to four nights a week at the home where he grew up, and where he still maintained two furnished rooms with a private entrance. In 1960, Blanchard moved from New Orleans (where his ancestral home was located)

*Kiehne v. Atwood,* 93 N.M. 657, 604 P.2d 123 (1979); *Klutts v. Jones,* 21 N.M. 720, 158 P. 490 (1916). Such cases are not controlling when a candidate (or a voter) maintains without interruption a long-term, significant physical presence at multiple residences.

In deciding whether a candidate for political office qualifies under applicable residence requirements, the pivotal question remains, as it was under *Williams:* Does the candidate actually "reside" at the place where the candidate registers to vote? In this sense, when we stated in *Williams* that a person may *have* only one place of residence for voting purposes, 57 N.M. at 592, 261 P.2d at 133, we might have stated more accurately that a person may *register* only one place of residence for voting purposes. The contestant has the burden of showing that the residence relied upon by the candidate as his qualifying residence is a sham, e.g., "nothing less than a deliberate attempt to evade the fundamental eligibility requirements expressly provided by our constitution and statutes." *See Thompson v. Robinson,* 101 N.M. 703, 705, 688 P.2d 21, 23–24 (1984) (by deceiving voters regarding his actual place of residence the candidate committed a fraud).

■ We assume, but do not decide, that the criteria set forth in Section 1–1–7 apply to determine this question. As discussed below, we believe substantial evidence was presented to establish El Portrero as Chavez' residence under both the voting and candidacy statutes.

*Intent and physical presence established El Portrero as a qualifying residence.* The dual requirement of intention

to Chicago, where he lived for six years. However, he claimed to have reestablished his domicile at his old address when he returned to New Orleans in 1966. In 1969, Blanchard moved to another address with his wife and children. Blanchard listed this home, which was outside the district, with the Custodian of National Archives for Orleans Parish as his home address, and used that address for tax purposes and on car registrations. As in the present case, the utilities and telephone were in Blanchard's name at the house where his wife and children resided. The *Blanchard* court concluded that Blanchard was established principally at this residence, not at his ancestral home as claimed.

(as evidenced, e.g., by registration) and physical presence is the long-standing test for determining a candidate's qualifying residence. "There must be the fact of abode and the intention of remaining." *Williams,* 57 N.M. at 593, 261 P.2d at 134; *see also O'Hern v. Bowling,* 109 Ariz. 90, 505 P.2d 550 (1973). Intent may be proved by declarations or by actions manifesting intent. *See Id.* at 92, 505 P.2d at 552.

The issue in the present case, like the issue in *Williams,* arises when a person maintains without interruption a significant physical presence at two or more homes over a long period of time. In such a case the facts, circumstances, and conduct that form the indicia of residence may not point unequivocally to one abode or another, and the determination of residence may turn largely on intent and the objective manifestations of intent found in the individual's actions. *See In re Estate of Elson,* 120 Ill.App.3d 649, 76 Ill.Dec. 237, 458 N.E.2d 637 (1983) (issue of residence is treated as a question of fact, rather than law, because determination of residence often turns on the intent of the party).

The facts reveal a continuous and substantial commitment by Chavez to maintenance of the family home and farm. Chavez' frequent overnight stays, private room, help with work, taking of meals with members of his extended family, use of the El Portrero address for all important documents, and his community associations and record of community service in Santa Fe County, all are consistent with the court's findings that Chavez has maintained a continuous and significant physical

We note the Louisiana court's reasoning, that the candidate in fact maintained only one true residence, may be seen as somewhat at odds with the tenor of this court's opinion in *Williams.* However, we are not free (nor are we inclined) to readdress the principles established in *Williams* and since adopted by the legislature in the Election Code. We believe, moreover, that the facts here provide stronger support to the trial court's judgment than they did in *Blanchard.* We also note that the majority opinion in *Blanchard,* overturning the trial court's decision in the candidate's favor, drew four dissenting opinions.

presence at the family home and has a present intent to make that home his permanent residence. The extent of his family's historical roots in the community and the evidence that Chavez intends to carry on family traditions also are consistent with the existence of an intent to be a resident of El Portrero, as are the longstanding understanding of the Chavez family that Chavez will inherit his parent's house and Chavez' present ownership interest in that house.

*Trial court reasonably determined that Chavez resided in Santa Fe County, rebutting any presumption from its finding that Chavez had maintained a home in Rio Arriba County for himself, his wife, and his children for twelve years.* Apodaca contends that Chavez failed as a matter of law to rebut the presumption contained in Section 1–1–7(B) that he resided at the abode of his wife and children.[5] In considering this argument, we view the evidence in the aspect most favorable to and indulge all reasonable inferences in support of the judgment, and we resolve conflicts in the evidence in favor of the successful party. *Williams,* 57 N.M. at 591, 261 P.2d at 133.

The fact that Chavez built and maintains a separate home for himself, his wife, and children in Chimayo, whether or not it creates a presumption of residence in Rio Arriba County under Section 1–1–7(B), may be viewed as facially inconsistent with an intent to be a resident of El Portrero. The fact that Chavez has occupied these premises with his nuclear family for twelve years increases the apparent discrepancy between his words and deeds.

However, evidence was presented at trial suggesting that (1) the Rio Arriba home was built for temporary purposes and was not located on Chavez property within San-

ta Fe County because of a lack of building space; (2) the understanding between Chavez, his parents, and his siblings regarding the inheritance of family property is in keeping with cultural practices in Hispanic communities of Northern New Mexico and Southern Colorado; and (3) individuals in Chavez' position in these communities often take up a new home at marriage, expecting to return to the home of their parents upon the death of the parents. A cultural anthropologist testified that in "Northern New Mexico [Hispanic] communities ... people may live in different houses, but the home is where your parents are, where the succession of title of land and so forth has come down." This evidence reasonably may be seen as corroborating Chavez' declared intent. It suggests that, from Chavez' perspective, maintenance of a home in Chimayo for his nuclear family actually is consistent with an intent to continue residing at the family placita in El Portrero.

*Candidate not required to reestablish residence when physical presence there has been uninterrupted and candidate possesses necessary intent.* Apodaca argues that Chavez' declared intent to use the El Portrero home as his exclusive residence at some future time does not form a sufficient basis from which to conclude that he has removed his residence from Chimayo to El Portrero. *See* §§ 1–1–7(C) and (G). This argument ignores the evidence of Chavez' continued physical presence at the family home in El Portrero throughout his sojourn in Chimayo and independent corroborating evidence consistent with an intent to reside at the El Portrero home. In short, since substantial evidence supports the inference that El Portrero *always has been* Chavez' residence, it was not necessary for Chavez to prove that he had removed himself from his home in

---

5. At oral argument, Chavez pointed out that the statutory presumption in Section 1–1–7(B) differs from the statute in *Carabello* in one other respect. Our statute provides that a person's residence is presumed to be "[t]he place where a person's family resides." The Pennsylvania statute established that "the place where the family *of a married man or woman resides*" was the voter's residence. 102 Pa.Commw. at 132, 516 A.2d at 786 (emphasis added). Because Section

1–1–7(B) does not contain reference to marital status, Chavez argues, our statute may be read to refer either to a person's nuclear family or to a person's extended family. We do not reach the question of whether the word "family" in Section 1–1–7(B) refers to the nuclear or extended family, as we conclude that, assuming Chavez bore the burden to show that El Portrero was his permanent residence, he met this burden.

Chimayo in order to establish that he resided in El Portrero.

*Participation in community affairs was evidence supporting the determination that Chavez resided in Santa Fe County.* Apodaca also argues that Chavez' continued registration as a voter of Santa Fe County over the last twenty years and his past service with governmental entities of Santa Fe County constitute a "flagrant violation" of the election laws. As such, Apodaca reasons, these acts cannot be viewed as evidence supporting Chavez' claim to be a resident of Santa Fe County. We disagree with Apodaca's premises and conclusion.

It is well established that "[t]he words 'residence' and 'resident' have no fixed meaning applicable to all cases, but are used in different and various senses, depending upon the subject matter." *Gallup Am. Coal Co. v. Lira,* 39 N.M. 496, 497, 50 P.2d 430, 431 (1935); *see also Williams,* 57 N.M. at 592, 261 P.2d at 133. The purpose of a residency requirement for candidacy is to insure that the candidate "has knowledge of the problems and the needs of the district...." *State ex rel. Rudolph v. Lujan,* 85 N.M. 378, 379, 512 P.2d 951, 952 (1973).

It follows that the domain of facts material to the determination of a candidate's residence includes facts tending to show the candidate's exposure to the problems and needs of the community he or she seeks to serve. In this sense, a person's "presence" in the community and intent to reside there may be indicated in part by the record of that person's participation in the political life and affairs of the community. Chavez' previous participation in politics and his continued registration as a voter in Santa Fe County reasonably suggest that Chavez remains involved with and is affected by events in Santa Fe County. While such participation, standing alone, would be insufficient to establish a residence, in the context of this case, Chavez' participation in the affairs of his community provides corroboration of his residence in Santa Fe County.

We conclude the trial court's determination that Chavez is a resident of Santa Fe County for candidacy purposes was supported by substantial evidence and comports with the meaning and purpose of the residence requirements of the Election Code and the Constitution.

■ *Trial court did not err in admitting expert testimony.* Finally, Apodaca protests the award of witness fees for a land title researcher and a cultural anthropologist on the grounds that their testimony was irrelevant to the question of Chavez' residence in Santa Fe County. *See* SCRA 1986, 11–401. The title researcher presented testimony on the historical roots of the Chavez family and El Portrero, which, as discussed above, corroborated the existence of an intent by Chavez to reside there. Likewise, the testimony of the anthropologist corroborated the existence of Chavez' declared intent by showing that his actions were consistent with relatively common cultural practices and understandings. We conclude the trial court did not abuse its discretion in admitting this testimony.

For the foregoing reasons, the judgment of the trial court is affirmed.

IT IS SO ORDERED.

SOSA, C.J., and WILSON, J., concur.